THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD LEONARD, Defendant-Appellant.

First District (5th Division)    No. 78-1985

Opinion filed January 25, 1980.—Rehearing denied February 21, 1980.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Wesley H. H. Ching, and Terrence M. Burns, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and was sentenced to a term of 30 to 60 years. On appeal, he contends that: (1) hearsay evidence was improperly admitted at trial; (2) the trial court erred in refusing to instruct the jury on either self-defense, voluntary manslaughter or involuntary manslaughter; (3) he was denied his right to present a defense because the trial court erroneously ruled that evidence of a prior conviction was admissible at trial if defendant testified, and because evidence relevant to his defense was excluded at trial; and (4) the trial court erroneously refused to clarify the law after a request by the jury. The pertinent facts follow.

Defendant made a motion *in limine* to bar the use for impeachment

of two prior convictions for forgery and delivery of narcotics. After argument the motion was denied. Defendant also made a pretrial motion to exclude evidence of a phone conversation between decedent and Freida Goldberg as inadmissible hearsay. After a *voir dire* examination of Ms. Goldberg, the motion was denied. The following pertinent evidence was adduced at trial.

## For the State

Patricia Ann Gorski, the decedent's sister, testified that on April 26, 1976, the day of the shooting, her brother, Wayne Tews, was 42 years old, 5′11″ tall and weighed about 200 pounds. He walked with a slight limp since he dislocated his hip as a child. He was employed as a security guard at a club at 1221 North Dearborn. When she last saw him on Easter of that year, he was in good physical condition. She next saw him on April 27, 1976, at a funeral home at which time he was dead.

Freida Goldberg testified. In April 1976 she was the resident manager of the apartment complex located at 1221 North Dearborn. At that time a discotheque called The Rhinocerous Club was located on the first floor of the building. The club was open for about six months but was closed in April 1976 because of nonpayment of rent. She was involved with the lease negotiations for the club with defendant and several others. She saw him occasionally thereafter standing at the entrance to the club and would say hello to him. Later, she showed him an apartment in the building.

Ms. Goldberg testified that Wayne Tews was the security guard at her building for about one year, and she had never had any complaints about him. At about 1 a.m. on April 26, 1976, she had been asleep for about 20 minutes when she received a telephone call. Wayne Tews identified himself and told Ms. Goldberg that the manager of The Rhinocerous Club wanted to get into the club. Tews then said, "He's got a gun" in a strange and nervous voice. She heard another voice, which she recognized as defendant's, saying "Tell the m_____ f_____ manager to come down now, now, now." She told Tews to stall and not to worry. She hung up and called the police.

On cross-examination Ms. Goldberg testified that she spoke with 10 to 15 persons daily in relation to her job.

Robert Reinschreiber testified that on the night of April 26, 1976, he had spent about 2½ to 3 hours at a lounge around the corner from 1221 North Dearborn. While there, he had several drinks. He left at about 1 a.m. with Richard Frenzel, Terry Moss and Ron Majcek and walked north on Dearborn Street to their car. As the group started to cross the street, he saw two men coming out of an apartment building struggling for a gun. One was wearing a security guard's uniform and the other wore a leather jacket. Defendant held the gun by the handle and the other man held it by

the barrel. The two struggled and the witness heard a shot. The security guard backed off and coughed. A stream of blood came out of his mouth. The struggle continued near a bannister until the guard "lost all his ability to fight back." Defendant pushed the guard over the bannister and the guard fell into bushes about six feet below. Defendant leaned over the bannister and yelled "Die, m_____ f_____, die" about five or six times at the guard.

The witness stated that he saw the incident from the middle of the street and had no difficulty seeing or hearing what transpired. He described defendant as looking "spaced out" as he came down the stairs without the gun after the shooting. A policeman arrived shortly thereafter and the witness informed him of what happened.

On cross-examination Reinschreiber stated that he did not see any blows struck between the two men and did not notice whether defendant's mouth was bleeding or his nose was cut.

Richard Frenzel, who accompanied Reinschreiber that night, witnessed the shooting and corroborated Reinschreiber's testimony. He stated that the struggle on the balcony lasted between 30 and 45 seconds. He did not see any blood coming from defendant's face or mouth.

Terry Moss, who was with Frenzel and Reinschreiber, corroborated their testimony. She noticed that the guard was taller and larger than the other man. She could not remember if the guard struck defendant nor did she notice whether defendant's mouth or nose was bleeding.

Mitchell Shacter, a Chicago police sergeant, testified. On April 26, 1976, at about 1 a.m., he was on duty in a marked squad car. After a conversation with several people, he went to the scene of the shooting and saw defendant walking toward him. He arrested defendant. After the arrest several people pointed at defendant and told Shacter that "He did it." Defendant was unarmed at the time of his arrest. A police wagon transported defendant to a police station and Shacter stayed at the scene. He found a .22-caliber automatic pistol about 18 inches from the decedent's body.

On cross-examination Shacter stated that at the time of arrest defendant's lower lip was cut.

Chicago police officer Ruback testified. He and his partner arrived at the scene shortly after the shooting. He searched the decedent's body for identification and found a .22-caliber gas pistol in his right pants pocket.

On cross-examination Ruback testified that when he saw defendant at the scene he saw blood coming from his mouth.

Dr. Tae An, a pathologist, testified. He performed an autopsy on the body of Wayne Tews on April 26, 1976. His external examination of the body revealed a bullet wound in the right front chest, two scalp lacerations in the back of the head, and a laceration on the right hand. The

body was 5' 11" in height and weighed 200 pounds. His internal examination revealed that the bullet had lacerated the right lung and the heart causing Tews' death.

On cross-examination Dr. An testified that he noticed a discoloration around the chest wound due to powder residue which indicated that the gun had been fired at very close range.

Chicago police officer Pribek, an evidence technician, testified that he recovered a discharged cartridge case, a weapon, and blood samples from the area of the shooting.

Chicago police sergeant Celovsky, a firearms expert, testified. He received two firearms, a discharged cartridge case, and a fired bullet in connection with this case. He test-fired the .22-caliber automatic pistol. Based on the tests he concluded that the discharged cartridge had been fired from the .22 automatic pistol. However, mutilation and damage to the bullet recovered by the pathologist made it unsuitable for identification. He also stated that the .22-caliber pistol recovered from Tews' body could not fire any bullets since its end was closed.

Prior to the defense case, the State moved to prohibit the introduction of testimony of Assistant State's Attorney Haddad and Chicago police investigator Cygnar regarding their conversations with defendant since the statements were exculpatory and self-serving. After argument, the court granted the State's motion.

*For the Defense*

Barbara Leonard, defendant's ex-wife, testified. On April 28, 1976, she visited defendant in jail for about 45 minutes. Ms. Leonard stated that she had not seen her husband for two or three days prior to her visit and that she went because defendant's attorney told her to do so. The court sustained the State's objection to any testimony regarding defendant's appearance on that date.

The defense made an offer of proof of the excluded testimony of Barbara Leonard. She stated that when she saw defendant in jail she noticed stitches around his mouth and swelling around the lower lip. His upper nose area near his eye was discolored and there were slight scratches around his face. He told her he was in a fight. When she last saw defendant prior to the visit in jail he did not have the injuries.

It was stipulated that on April 26 defendant was treated in a hospital emergency room and received three stitches for a laceration in his lower lip, and a tetanus shot. The defense rested.

Defendant sought to have instructions on self-defense, voluntary and involuntary manslaughter submitted to the jury. After argument, the court ruled that none of the instructions would be given. The defense also sought to have the court reconsider the motion *in limine* to bar

impeachment by defendant's prior convictions. The court refused to change its prior ruling.

After the State's argument, defendant waived closing argument. Instructions were submitted to the jurors, and they retired. During deliberations, the jury sent a message to the court stating: "We would like a legal opinion on self-defense." After discussion with counsel for both sides, the court decided to have the jury told that they had heard the evidence and received the instructions, and should apply the instructions to the evidence they had heard. Counsel for each side stated that he had "No objection" to this procedure.

The jury found defendant guilty of murder and judgment was entered on the verdict.

OPINION

I

Defendant contends that Freida Goldberg's testimony regarding Tews' statement that "He's got a gun" was erroneously admitted as an excited utterance since there was no independent evidence besides the statement itself to establish the startling event. The three factors necessary to bring a statement within the excited utterance exception are: (1) a sufficiently startling occurrence to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.) Defendant argues that in the absence of any proof of the startling event independent of the statement itself, there is no means to ascertain whether a significant lapse of time existed between the event and the statement to allow fabrication or whether the event was sufficiently startling to elicit a spontaneous and unreflecting statement. He urges that in the absence of any independent proof of the event a proper foundation was not laid for the admission of the statement and that the statement was "bootstrapped" into evidence by providing its own foundation. The question presented is whether the declaration itself is sufficient proof of the event to meet the first requirement of the excited utterance exception to the hearsay rule.

Defendant has not cited nor has research revealed an Illinois case dealing with this precise issue. Defendant has cited several cases from foreign jurisdictions including *Truck Insurance Exchange v. Michling* (Tex. 1963), 364 S.W.2d 172, which would preclude introduction of the statement in the absence of independent proof of the startling event.

The State relies on *People v. Poland* arguing that there is sufficient proof of the event if it appears inferentially that the declarant personally observed the event and the declaration and surrounding circumstances indicate that the declarant witnessed a startling event. Unlike *Poland*,

which involved the declarant's opportunity to observe the subject of the statement, in the instant case it is clear that the declarant was present and could observe the matter of which he spoke. It is proof of the event, absent the declaration itself, which is lacking in the instant case. Concerning this issue, Professor McCormick states:

> "* * * Under generally prevailing practice, the declaration itself is taken as sufficient proof of the exciting event and therefore the declaration is admissible despite absence of other proof that an exciting event occurred. The Texas courts, however, have recently taken the position that an excited utterance is admissible only if other proof is presented which supports a finding of fact that the exciting event did occur [noting *Truck Insurance Exchange v. Michling* as the leading case]." McCormick, Evidence §297, at 705 (2d ed. 1972).

An analysis of the rationale in *Truck Insurance Exchange v. Michling* convinces us that in the absence of other independent proof of the startling event, Freida Goldberg's statement should not have been admitted at trial. That case involved a workmen's compensation claim wherein the only evidence that the deceased sustained an injury in the course of his employment was the testimony of his wife. She testified that on the day in question her husband left for work in good health, but upon his return home, he was stumbling, batting his eyes, and was very pale. She stated that he told her that "he had hit his head on the bulldozer, the iron bar across the seat. It slipped off the hill and he hit his head." No other evidence that the deceased was injured at work was introduced. The Supreme Court of Texas held that the testimony was improperly admitted since there was no independent proof of the basic event and reversed the judgment which was in favor of the deceased's beneficiaries. In so doing, the court reasoned:

> "A hearsay statement, as res gestae, is admitted as an exception to the hearsay rule because it is made under circumstances which raise a reasonable presumption that it is the spontaneous utterance of thought created by or springing out of the occurrence itself and, so to speak, becomes a part of the occurrence. But in this case the only evidence of the occurrence is the hearsay statement. Thus the Court of Civil Appeals is conceding credit to a narrative to prove the very circumstances from which it is said to derive its credit. Its trustworthiness, as to the happening of an accident, is presumed from the influence of the accident which its trustworthiness is taken to prove. Thus this proof, to use a trite expression, is attempting to lift itself by its own bootstraps." 364 S.W.2d 172, 174.

Establishment of the startling event by some evidence, whether direct or circumstantial, would be a condition precedent to the admission

of a statement which is dependent upon that event for its supposed trustworthiness. To hold otherwise would allow the statement to be taken as true to establish the event or circumstance which in turn gives the statement its indicia of reliability and makes it admissible.

■■ In the instant case, the startling event relied upon is the presence of defendant armed with a gun. Direct or circumstantial proof that defendant approached Tews with the gun was necessary to establish this startling event and render the statement admissible. Absent the statement itself, the testimony of the eyewitnesses established that two men were struggling over a gun outside the building and that defendant held the handle while Tews held the barrel. While it could be inferred from this evidence that defendant approached Tews, the opposite is also true. We recognize that the determination of whether the elements of the excited utterance exception are present is generally within the discretion of the trial court (*People v. Kilgore* (1976), 39 Ill. App. 3d 1000, 350 N.E.2d 810; *Lewis v. Beckman* (1978), 57 Ill. App. 3d 482, 373 N.E.2d 589) and that each case must be decided on its own facts. (*Lewis v. Beckman*.) However, since the startling event was not established by direct or circumstantial evidence independent of the statement, the first element of the exception was lacking. Without this element, a proper foundation was not laid for the evidence and its admission was error.

## II

Defendant contends that the jury should have been instructed on: (a) involuntary manslaughter; (b) voluntary manslaughter; and (c) self-defense. It is well settled that in homicide cases, if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction should be given. (*People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 373.) In addition, slight evidence of self-defense will justify giving an instruction on that theory. (*People v. Sunquist* (1977), 55 Ill. App. 3d 263, 370 N.E.2d 864; *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.) We will address each of these issues to see whether instructions should have been given at trial.

## A.

■ Section 9—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—3(a)) defines involuntary manslaughter as:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, * * *."

Defendant contends that from the evidence presented at trial a jury

could conclude that he acted recklessly in pointing a loaded pistol at Tews and that the death was unintended. Even if defendant's conduct were to be considered reckless, there is no evidence that the killing was unintentional. Defendant's repeated command that Tews die showed that the killing was intentional. The trial court properly refused to give an instruction on involuntary manslaughter.

## B.

Defendant also contends that the jury should have been instructed on voluntary manslaughter since there was evidence that at the time of the shooting defendant and Tews were engaged in mutual combat. Section 9—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(a)) provides in pertinent part:

> "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> > (1) The individual killed * * *.
> >
> > Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

One of the types of conduct recognized as serious provocation is mutual quarrel or combat. (*People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451.) The testimony of three eyewitnesses established that defendant and Tews were wrestling for the gun just prior to the shooting. Although none of the witnesses saw any blows struck, there was evidence that defendant's lip was split and required three sutures, and that there were lacerations on Tews' right hand and the back of his head. This would be some evidence that mutual combat occurred.

The State relies on *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131, *cert. denied* (1972), 409 U.S. 914, 34 L. Ed. 2d 175, 93 S. Ct. 247, and argues that any fighting by Tews was a defensive response to an unprovoked lethal assault by the defendant. In *Handley,* the victim was beaten by a number of persons over a period of time estimated to be in excess of 20 minutes. During that time the victim had succeeded in knocking down two of his assailants and in choking one of them. Defendant contended that that was evidence which justified the giving of a voluntary manslaughter instruction. The supreme court held that in view of all the circumstances surrounding the incident, particularly the fact that the fight was not a "one on one" situation, the victim's actions could not be considered a serious provocation for the beating he received.

Unlike *Handley,* the instant case involves combat between only two men. In addition, when Freida Goldberg's hearsay statement is disregarded, there is no evidence to show how the fight began or what

preceded the exit of the building. The testimony concerning the events outside the building could establish a mutual combat. Defendant's shouting at Tews after the shooting would be consistent with intense passion. Since there is evidence in the record of a mutual combat from which a jury could find that defendant acted under an intense passion, an instruction on voluntary manslaughter should have been given at trial. *People v. Craven* (1973), 54 Ill. 2d 419, 299 N.E.2d 1.

### C.

Defendant also contends that the jury should have been instructed on the use of force in defense of person (self-defense). Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 7—1) defines the circumstances under which deadly force in defense of a person is justified and provides in pertinent part:

> "* * * [a person] is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, * * *."

Justifiable use of force is an affirmative defense (Ill. Rev. Stat. 1977, ch. 38, par. 7—14; *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31) which requires that defendant must present some evidence thereon unless the State's evidence raises the issue. Ill. Rev. Stat. 1977, ch. 38, par. 3—2; *Bratcher.*

Defendant claims that because of the disparity in size between Tews and himself and the evidence of his injuries, the jury could have found that he reasonably believed that he was in danger of death or great bodily harm. We note that while evidence of Tews' size was presented at trial (5' 11" tall and 200 pounds), there was no such evidence regarding defendant. The jury was not aware of defendant's size except by its observations in court. Terry Moss, an eyewitness to the shooting, did testify that one man was larger and taller than the other man. From the presentence report in the record, it appears that defendant is 5' 10½" tall and weighs about 130 pounds.

However, the difference in size of the two men and the evidence of the struggle was not enough, standing alone, to raise the issue of self-defense. There was no evidence presented by the State to suggest that defendant was in imminent danger of death or great bodily harm. None of the eyewitnesses saw any blows exchanged, and two of the three testified that defendant held the handle of the gun. There was no evidence that Tews was attacking defendant or had made any threats to him. Nor were injuries suffered by defendant of such a serious nature as to cause one to reasonably believe that death or great bodily harm was imminent. Finally, the words defendant chanted to Tews after the shooting belie any

suggestion that he acted in self-defense but rather demonstrate the aggressive nature of his act.

■■ Since the affirmative defense was not raised by the State's evidence, defendant had to present some evidence to raise the issue of self-defense. However, defendant did not present any additional evidence which would suggest that he acted in self-defense. Since no evidence of self-defense was presented at trial, the trial court properly refused to instruct the jury on the issue. *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.

### III

Defendant next contends that he was denied his right to present a defense because: (1) the trial court ruled that defendant's prior conviction for delivery of a controlled substance was admissible for impeachment and defendant was thereby deprived of his right to testify in his own defense; and (2) evidence of defendant's physical condition two days after the shooting was improperly excluded.

Although the trial court ruled that defendant's forgery *and* delivery of cocaine convictions were admissible for impeachment, defendant claims error resulted from the ruling on his 1977 Federal conviction for delivery of cocaine. He relies on *People v. Siebert* (1979), 72 Ill. App. 3d 895, 390 N.E.2d 1322, where this court held that impeachment by a conviction for possession of marijuana for sale was error where that crime occurred two weeks after the offense on trial. Defendant claims that since it was noted in *Siebert* that a drug conviction has no direct bearing on a person's credibility, and defendant here was prevented from testifying at trial because of the ruling, the trial court's ruling was erroneous.

■■ It is clear that the requirements for admissibility set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, are satisfied in the instant case. In addition, as noted by defendant, in *Siebert* two charges were involved, attempt murder and delivery of a controlled substance. The use of the prior conviction for impeachment on the attempt murder charge was held proper in *Siebert*. Concerning the delivery charge, the prejudice outweighed the probative value simply because the crime for which defendant was previously convicted occurred only two weeks after the offense for which defendant was being tried and involved a nearly identical crime. Here, as in *Siebert*, the prior drug conviction was properly admissible for impeachment purposes at defendant's murder trial since the conviction would not show a propensity to commit the crime charged but would be relevant to the question of credibility. Defendant attempts to distinguish *Siebert* by claiming that the denial of the motion to exclude evidence of the conviction resulted in Leonard's decision not to testify in his own behalf and thereby denied him his right

to present a defense. This argument was rejected in *People v. Ganter* (1977), 56 Ill. App. 3d 316, 371 N.E.2d 1072, and *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 394 N.E.2d 1340. Defendant was not prevented from presenting a defense by the court's ruling but decided as a part of trial strategy not to testify at trial.

The second part to defendant's contention is that the court improperly excluded Barbara Leonard's testimony regarding defendant's physical condition when she visited him at jail, two days after the shooting. In the offer of proof she testified that she saw stitches around defendant's mouth, swelling near the lower lip, a discoloration around one of his eyes, and several scratches about his face. The testimony was excluded at trial as being immaterial.

■■ The test of admissibility of evidence is whether it fairly tends to prove the particular offense charged, and any circumstances may be put in evidence which tend to make the proposition at issue more or less probable. (*People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2629; *People v. Outlaw* (1978), 67 Ill. App. 3d 327, 384 N.E.2d 898.) The thrust of the defense case was that defendant acted in self-defense or that he acted under a sudden and intense passion due to serious provocation caused by mutual quarrel. The evidence of defendant's facial bruises would have been relevant to show that a mutual quarrel may have preceded the shooting and that substantial provocation existed for defendant's acts. Therefore, it would not have been improper to admit Barbara Leonard's testimony concerning the stitches and swelling of the lower lip since it was established by prior evidence at trial that these injuries were present immediately after, and were probably a result of, the occurrence. However, since this testimony was cumulative of other evidence, it was not error to exclude it. (*People v. Raby* (1968), 40 Ill. 2d 392, 240 N.E.2d 595, *cert. denied* (1969), 393 U.S. 1083, 21 L. Ed. 2d 776, 89 S. Ct. 867; *People v. Godbout* (1976), 42 Ill. App. 3d 1001, 356 N.E.2d 865.) On the other hand, her testimony regarding the discolored eye and facial scratches was properly excluded at trial because there was no evidence that these injuries were present immediately after the scuffle nor any evidence which would negative the possibility that they occurred during the two days between the fight and Barbara Leonard's visit. Absent a showing that the additional injuries were the result of the altercation with Tews, the evidence would not be relevant. Accordingly, the court did not err in excluding Barbara Leonard's testimony.

## IV

■■ Defendant's final contention is that plain error occurred after the trial court failed to instruct the jury on self-defense in response to its

request. The trial court suggested that a note be returned noting that the jury had heard the evidence and had received all the instructions. Each counsel responded "No objection," impliedly agreeing to this procedure. Defendant should not now complain of the trial court's failure to give additional instructions. (*People v. Hooker* (1977), 54 Ill. App. 3d 53, 369 N.E.2d 147; *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) Even if defense counsel's failure to object is not construed as a waiver of this issue, since there was no evidence presented at trial which would justify a self-defense instruction, the trial court did not commit error in not giving the jury additional instructions. See *People v. Jones* (1976), 40 Ill. App. 3d 771, 353 N.E.2d 79.

Because of the failure of the trial court to instruct the jury on voluntary manslaughter, and because of the erroneous admission of Freida Goldberg's statement, defendant's conviction must be reversed and the cause remanded for a new trial.

Reversed and remanded.

SULLIVAN, P. J., and WILSON, J., concur.