THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVEN GANTER, Defendant-Appellant.

First District (3rd Division)    No. 76-581

Opinion filed December 28, 1977.

Richard H. Trais and James P. Kane, Jr., both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, James Veldman, and Mary Ann Callum, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

Defendant was found guilty by a jury of the murder of John Thomas and attempt armed robbery. He appeals from his conviction.

The State's principal witness, Benton Fisher, testified that at approximately 3:30 p.m. the day of the incident, he was working near the meat counter in the back of a grocery store located at 3925 West Huron in Chicago, owned by his brother, John Thomas. Thomas was working in the front of the store near the cash register when three men entered the store. Two of the men remained at the front of the store while the third walked toward the back within a foot and a half of Fisher. After inquiring of Fisher about the price of meat, this man pulled a revolver and announced a stickup. Fisher identified this man at trial as the defendant, Steven Ganter.

While Fisher stood with his hands up, the defendant walked past him at close range and proceeded toward Thomas at the front of the store. Upon reaching Thomas who stood with his hands up, defendant shot Thomas twice. Thomas then grabbed defendant by the wrists, turning him so that defendant's face was visible to Fisher. Fisher pulled his own hand gun and shot defendant several times. When his gun jammed, Fisher ran into a back room, took a rifle and stood in the doorway of the back room. Upon hearing more shots fired, Fisher aimed and fired his rifle. The three offenders fled out the front door and headed east on Huron Street on foot. Fisher returned to the back room and attempted to contact the police. When he did not receive any answer from the police number, he called Mae Thomas, the victim's wife, and asked her to call the police. Mrs. Thomas testified that she received this call at 3:30 or 3:45 p.m.

Fisher gave the police the following description of the defendant when

they arrived: A dark-skinned man 6 feet to 6 feet 2 inches, 170 to 180 pounds, wearing a black leather jacket with white threads, black pants, cap, and a white or grey pearl earring in his left ear. Later in the day Fisher accompanied two police officers to Franklin Boulevard Hospital. While in the waiting room, Fisher observed a black leather jacket and identified it as the one the offender had been wearing. Other testimony at trial established that the jacket belonged to the defendant.

Clifton Ely testified that on the day of the incident he lived at 625 North Springfield, about a block and a half east of the grocery store. Ely was at home when his son returned from work and called him outside where defendant was lying wounded. Ely placed the time at around 3:30 p.m., although an answer he gave to an ambiguous question on cross-examination indicated it might have been around 3 p.m. Ely testified that defendant was wearing a black leather jacket and an earring. Ely called the police and when they failed to arrive after 5 or 10 minutes, he and his son placed the defendant in their car and proceeded to the Franklin Boulevard Hospital.

Chicago police officer William Stump testified that he was driving an unmarked police vehicle about 7 or 8 blocks from the grocery store when he received a radio communication about the shooting. As he reached the store, firemen were removing Thomas' body. In the store he overheard an individual giving other policemen a description of the murderer. He then left the store to patrol the area. He was driving east on Huron when another car pulled alongside and attracted Stump's attention. A passenger in the car told Stump they had a wounded individual in the back seat. Stump saw the Elys in the front of the car and the defendant in the back. Defendant was slumped over and wearing a black leather jacket. The Elys followed Stump to the Franklin Boulevard Hospital. Upon arriving at the hospital, Stump arrested the defendant when he observed that the defendant met the description of the murderer. Stump noticed at that time that the defendant was wearing an earring in his left ear. At trial, Stump identified the defendant as the person he saw in the rear seat of the Elys' automobile, and stated that defendant's left ear had a hole in it.

The defense called the supervising nurse at Franklin Boulevard Hospital who testified that her report on the defendant was time-stamped 3:45 p.m. as the time he entered the hospital. Her testimony was that it was the hospital's practice to time-stamp a record as a patient was admitted, and that as a rule the time-stamp could not be off 5 minutes either way. She remembered neither the specific day in question nor who placed other information on the records relating to the defendant.

Defendant's first trial resulted in a mistrial when the jury failed to return a verdict. Prior to commencement of the second trial, defendant moved to suppress Fisher's identification testimony. At the hearing on this

motion, Fisher testified that upon reaching Franklin Boulevard Hospital he was taken by a police officer into a room where the defendant was lying in a bed, and he identified the defendant as the person who killed Thomas. Fisher was then taken by police officers to other hospitals in the area where he looked at other patients. The trial judge concluded that suggestive procedures were used when Fisher identified the defendant at the hospital and, therefore, excluded this identification.

The State then offered evidence to demonstrate that Fisher could make an in-court identification independent of the suggestive procedures. Fisher testified that he talked to the defendant in the store at a distance of approximately 4 to 6 feet, that twice during the time the robbery was in progress, he was within one and one half feet of the defendant, and that when the shooting started, the defendant was 10 feet away. Fisher further testified that the incident took place during daylight and that the store lights were on. He stated that he observed defendant for 3 of the 5 minutes that the entire incident lasted. The trial judge prohibited defense counsel from cross-examining Fisher about lineups in which Fisher had viewed a co-defendant, and about what happened at the other hospitals Fisher visited after identifying the defendant at Franklin Boulevard Hospital. The court concluded that the description Fisher gave, the opportunity he had to observe the defendant and his proximity to the defendant during the robbery established an independent basis for an in-court identification.

The defendant moved prior to the first trial to suppress introduction of defendant's prior armed robbery conviction into evidence, and this motion was denied. At the second trial, defense counsel agreed to adopt all motions presented prior to the first trial and rulings thereon instead of repeating them at the second trial. The ruling on the motion regarding introduction of the defendant's prior conviction thus applied to the second trial.

The issues raised on this appeal are: First, whether the court erred in failing to suppress Fisher's in-court identification of the defendant and whether the trial judge at the hearing on the motion to suppress this identification improperly restricted the cross-examination of Fisher; second, whether the defendant was proved guilty beyond a reasonable doubt; third, whether the prosecutor's rebuttal argument was improper and prejudicial; and fourth, whether the court erred in ruling that defendant's prior conviction could be used to impeach the defendant if he testified at trial. The defendant also contends that his sentence of 20 to 30 years should be reduced because of the disparity between his sentence and that of his co-defendant.

■■ Defendant contends that the State failed to sustain its burden of showing that Fisher's in-court identification had an origin independent of

the suggestive identification procedures at the hospital. Where a pretrial identification confrontation is held to be suggestive, an in-court identification may nevertheless be admissible if it is shown by clear and convincing evidence that the courtroom identification had an independent origin arising from an earlier uninfluenced observation of the defendant. *People v. Camel* (1974), 59 Ill. 2d 422, 431, 322 N.E.2d 36; *People v. Blumenshine* (1969), 42 Ill. 2d 508, 513, 250 N.E.2d 152; *People v. Cook* (1969), 113 Ill. App. 2d 231, 236-37, 252 N.E.2d 29.

The following criteria to be considered in determining whether an independent origin exists for an identification are set forth in *Camel*: Opportunity of the witness to view the accused at the time of the crime; the accuracy of the witness's prior description of the crime; the witness's degree of attention; and the length of time between the crime and confrontation. (*Camel*, at 432.) Although the identification of a defendant by the victim at a hospital was held suggestive in *Cook*, an independent basis for an in-court identification was approved because of a face-to-face confrontation during the crime, good lighting conditions, corroboration, and no conflicting identification.

Fisher had ample opportunity to view the murderer while the robbery was in progress. He provided a detailed description of the defendant immediately after the shooting which was not contradicted. On the contrary, it was corroborated. For example, Fisher pointed out defendant's jacket at the hospital before he viewed defendant, and Mr. Ely testified that the defendant was wearing a black jacket and an earring when he saw the defendant. Officer Stump stated that the defendant was wearing an earring in his left ear at the time of arrest, and at trial Officer Stump observed that the defendant's left ear had a hole in it. These facts convincingly establish that prior to and independent of the suggestive showup, Fisher had an uninfluenced observation of the defendant that was sufficient to support his in-court identification.

■■ Defendant argues that the hearing on the motion to suppress defendant's identification by Fisher was deficient because the court prohibited cross-examination as to (1) Fisher's failure to identify a co-defendant at an initial lineup, and (2) Fisher's viewing of other patients at various hospitals after Fisher had identified the defendant at Franklin Boulevard.

One of the purposes of the pretrial hearing was to determine whether Fisher had an independent basis for an in-court identification. Fisher's viewing of other hospital patients was not relevant to this inquiry. It did not encompass the time period of the shooting and, therefore, would not address issues relevant to the opportunity Fisher had to view the murderer such as the lighting conditions in the store, Fisher's degree of attention, and the distance between Fisher and the killer.

The line of inquiry as to Fisher's failure to identify a co-defendant at an initial lineup suffers from the same infirmities. It involved the pretrial identification procedure regarding another offender, rather than the defendant, it dealt with events which took place after the shooting, and would fail to disclose whether Fisher had the same opportunity during the robbery to observe the co-defendant as he had to observe the assailant. Thus, this line of inquiry would only have interjected irrelevant collateral issues into the hearing.

The trial judge acted properly in prohibiting the attempt to cross-examine Fisher on these matters. In doing so, he correctly limited the scope of the inquiry to Fisher's opportunity to observe the killer during the commission of the crime.

The defendant advances three different arguments in support of his contention that the State failed to prove him guilty beyond a reasonable doubt. First, relying upon the report of the emergency room nurse stating that the defendant entered the hospital emergency room at 3:45 p.m., defendant asserts that the crime occurred either after he was already in the hospital or so near his admittance that he could not have participated in the robbery. The defendant points out that the State's witnesses established that the crime occurred at or after 3:30 at the earliest, and all of the events including the robbery, defendant's flight, his subsequent discovery outside the Ely home and a trip to the hospital could not have occurred between 3:30 and 3:45 when the hospital records show he was admitted. Thus, defendant argues that the time of his admission to the hospital shown by the emergency room record conclusively demonstrates that he could not have been at the scene of the crime 15 minutes earlier.

While the hospital record is perhaps inconsistent with the evidence presented by the State at trial, it does not destroy the other overwhelming evidence of the defendant's guilt. Officer Stump testified that he was in his patrol car 7 to 8 blocks from the store when he first received word of the shooting. He then traveled the distance to the store, entered the store and obtained a description of the killer. After leaving the store, he patrolled the area until he encountered the Elys. All of this took place between the time of the shooting and the time Stump first encountered the defendant. Officer Stump's testimony therefore established that the defendant had ample time before he was admitted to the hospital to commit the crime, to go one and one half blocks to the Ely residence, be discovered by the Elys and then be taken to the hospital. This evidence alone would be sufficient for the jury to conclude the hospital record was inaccurate.

The record is replete with other evidence of defendant's guilt. The jury heard the extensive and unshaken testimony of eyewitness Fisher. The detailed description Fisher gave to police was corroborated by Mr. Ely and Officer Stump shortly after the shooting. The very fact that defendant

was found lying wounded such a short distance from the store in the direction Fisher stated the defendant had fled was circumstantial evidence of his guilt.

■■ The jury obviously believed the testimony of the State's witnesses rather than the accuracy of a hospital record offered by the defendant. In a jury trial, the credibility of witnesses is for the jury to determine, and its decision will not be disturbed unless it is based upon evidence which is so unsatisfactory as to raise a reasonable doubt. (*People v. McDonald* (1975), 62 Ill. 2d 448, 456, 343 N.E.2d 489; *People v. Coleman* (1971), 49 Ill. 2d 565, 573, 276 N.E.2d 721; *People v. Smith* (1974), 20 Ill. App. 3d 756, 760, 314 N.E.2d 543.) The combined testimony of Ely, Stump and Fisher presented a coherent credible time sequence, and, therefore, the verdict must stand.

■■ Second, defendant broadly states that no physical evidence introduced by the State placed the defendant in the grocery store. Defendant specifically recites: (1) No fingerprints of defendant were found in the store, (2) no murder weapon was recovered, (3) no proof was introduced of whether the bullets in defendant were shot by either Fisher or Thomas, and (4) the earring Fisher claimed defendant was wearing was not introduced into evidence. Although the defendant, of course, could have argued to the jury that the absence of this evidence tended to disprove the State's case, defendant has cited no law, nor is there any law, that requires the introduction of this evidence in order to establish defendant's guilt beyond a reasonable doubt. Despite the absence of this physical evidence, the evidence presented by the State is more than sufficient to support the guilty verdict.

■■ Third, defendant directs attention to alleged gaps and contradictions in Fisher's testimony and claims that the existence of these defects prohibits a finding of guilt by the jury. He argues that the State offered no explanation as to why the defendant did not shoot Fisher, if, as Fisher testified, the defendant was next to him when the stickup was announced. Although the exact reason why Thomas was selected as the victim remains locked in the defendant's mind, it may be explained by the fact that Thomas was near the cash register, the obvious object of this criminal venture. Whatever the reason, the State was not required to explain why defendant elected not to shoot Fisher in order to establish that he murdered Thomas.

■■ The defendant points to another alleged gap in Fisher's testimony. The defendant was shot three times and Fisher's gun had five bullets in it when the police arrived. Another bullet of the same caliber was recovered in the store, and defendant argues this means that nine bullets of the caliber used by Fisher's gun were found. Since Fisher's gun holds only eight bullets, the defendant contends that the State failed to establish the

origin of this ninth bullet. It could be that the other two offenders had guns of the same caliber as Fisher's gun or that one of the bullets in Ganter came from Fisher's rifle or that Thomas fired a gun of the same caliber as Fisher's handgun. In any event, the State's failure to account for a single bullet hardly creates a reasonable doubt in the face of the overwhelming proof of guilt.

■■ Defendant points out that Fisher was impeached as to when children in the store left once the shooting started, as to whether or not he placed boxes of bullets on a couch after the shooting, and whether he removed a jammed bullet from his handgun. These are nothing more than minor inconsistencies in the testimony of eyewitness Fisher. Minor discrepancies in the testimony of an eyewitness do not destroy credibility and are for the trier of fact to weigh in its deliberations. (*People v. Bell* (1972), 53 Ill. 2d 122, 125-26, 290 N.E.2d 214; *People v. Miller* (1975), 31 Ill. App. 3d 436, 446, 334 N.E.2d 421; *People v. Rogers* (1974), 23 Ill. App. 3d 115, 119, 318 N.E.2d 715.) Where identification testimony is positive as in the present case, precise consistency as to purely collateral matters is not required in order to establish guilt beyond a reasonable doubt. *People v. Henderson* (1976), 36 Ill. App. 3d 355, 367-68, 344 N.E.2d 239; *People v. Curtis* (1967), 90 Ill. App. 2d 231, 233-34, 232 N.E.2d 457.

The defendant's attack on the testimony of Benton Fisher has at best pointed out only minor shortcomings. We, therefore, conclude that on the basis of Fisher's eyewitness testimony and its corroboration, the jury was justified in finding the defendant guilty.

■■ The defendant has raised several objections to the prosecutor's rebuttal argument. First, the defendant urges that the argument called the jury's attention to the defendant's failure to testify. The specific statements of which defendant complains are as follows:

> "Have you been offered one reasonable explanation * * * as to how Steven Ganter got shot other than what our witnesses have told you? The evidence that you have heard brings you to only one conclusion. Steven Ganter got shot by Benton Fisher. Is there any evidence of any other possibility?"

These comments were in response to the defense counsel's contention during his argument that the fact defendant was shot on the day Thomas was killed was just a coincidence, and in fact the defendant was shot at a different site than the murder scene.

■■ The State's rebuttal argument was not comment on the defendant's failure to testify. The test to be applied is whether the reference was intended or calculated to direct the attention of the jury to the defendant's failure to avail himself of the right to testify. (*People v. Jones* (1970), 47 Ill. 2d 66, 69-70, 264 N.E.2d 189; *People v. Mills* (1968), 40 Ill. 2d 4, 8-9, 237 N.E.2d 697.) The contested statement does not call the

jury's attention to defendant's failure to testify, but is a justified comment on the fact that the only explanation of how Ganter was shot came from the State. It is permissible for a prosecutor to comment on the uncontradicted nature of the State's case even where the only person who could have contradicted the State's evidence was the defendant himself. *Mills*, at 8; *People v. Norman* (1963), 28 Ill. 2d 77, 81, 190 N.E.2d 819.

■■ The defendant also objects to these comments, contending they placed the burden of proof on defendant to prove himself innocent. Unlike *People v. Weinstein* (1964), 35 Ill. 2d 467, 220 N.E.2d 432, where the prosecutor stated in his closing argument that the burden was on the defendant to create a reasonable doubt, and *People v. Blissitt* (1973), 12 Ill. App. 3d 551, 299 N.E.2d 562, where the prosecutor stated to the jury during closing argument that the State's evidence was uncontradicted when in fact there was contradictory evidence, the questioned statement was simply accurate comment on the evidence presented in the case. Nothing said by the prosecutor either expressly or implicity shifted the burden of proof to the defendant.

■■ Defendant also contends that he was prejudiced when the State's Attorney during closing argument referred to him as a "killer." Although the comment may be an attempt to arouse the jury's emotions, it was a permissible trial tactic. In *People v. Wright* (1963), 27 Ill. 2d 497, 190 N.E.2d 287, the prosecutor during closing argument labeled the defendant a killer and a parasite. The court held that it was proper to characterize the accused in that manner when the comments were legitimate inferences from the evidence, and that it is permissible for the prosecution to denounce the accused's wickedness and even indulge in an invective. In this case the evidence that Ganter shot and killed Thomas was substantial, and the prosecutor's remark was a legitimate inference from this evidence. See *Wright,* at 500-01; *People v. Smith* (1962), 24 Ill. 2d 198, 200, 181 N.E.2d 77.

■■ The defendant complains of two more remarks made by the prosecution. The first was a response to the defense counsel's query in closing argument as to why eyewitness Fisher did not notice a gap in the defendant's front teeth. In response to this, the State's Attorney stated during rebuttal argument: "He [Ganter] would have to open his mouth and smile * * * so give Mr. Ganter credit that when Mr. Ganter commits murder, he doesn't smile." The defendant cannot complain of this remark for it was provoked, if not actually invited, by defense counsel's remarks concerning Fisher's failure to notice the gap. Under these circumstances, it was a natural and proper response to the argument of defense counsel. *Smith,* at 200; *People v. Izzo* (1958), 14 Ill. 2d 203, 151 N.E.2d 329; *People v. Wheeler* (1955), 5 Ill. 2d 474, 126 N.E.2d 228.

■■ The last remark objected to also was in response to a statement in

defense counsel's argument. Defense counsel argued to the jury that the police should have searched for the murder weapon more thoroughly because it was still at the murder site. In response, the prosecutor stated that Steven Ganter had the murder weapon last and that he, the State's Attorney, did not know where Ganter threw it when he ran out the door. The evidence in this case that Ganter used a gun to kill Thomas was strong, and, therefore, the prosecutor's remark was a proper inference from this evidence. (See *Smith,* at 200.) The State's Attorney was properly answering questions raised by the defense counsel. The response was invited by the remarks of the defense counsel and defendant cannot claim that he was prejudiced by the reply. *Wheeler,* at 486.

The rebuttal argument of the State's Attorney was proper in all respects. It was not prejudicial, it was based on substantial evidence and it answered questions raised by the defense counsel in his closing argument.

■■ Defendant contests the pretrial ruling that defendant's prior armed robbery conviction could be used for impeachment purposes if he testified at trial. Defendant claims this was erroneous because the possibility of prejudicial effects from this type of impeachment prevented him from taking the witness stand. The mere fact that the defendant decided not to risk the possibility of prejudicial impeachment does not mean that the ruling was erroneous. If so, any time a defendant unsuccessfully moves prior to trial to suppress use of a prior conviction, the defendant on appeal would be able to defeat the trial judge's discretion, regardless of whether the ruling was legally correct, by arguing that it prevented him from testifying at trial.

■■ Defendant also claims that since 5 years had passed between the prior conviction and the defendant's second trial, the trial judge should have ruled against use of the prior conviction. The 5-year interval satisfies the guidelines set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. And, defendant's prior conviction meets all other requirements for use for impeachment purposes. See *Montgomery,* at 516-17; *People v. Kitchen* (1977), 52 Ill. App. 3d 521, 368 N.E.2d 528.

Defendant argues his sentence should be reduced because of disparity between it and the sentence his accomplice received. The accomplice pled guilty to attempt armed robbery and was sentenced to 3 to 6 years. While a defendant should not be punished by a heavy sentence merely because he exercises his constitutional right to receive a trial (*People v. Martin* (1970), 47 Ill. 2d 331, 339, 265 N.E.2d 685), mere disparity between a sentence imposed on a defendant who stands trial and another on a co-defendant who pleads guilty does not of itself necessitate action by the reviewing court. The reason for the disparity is controlling. *Martin,* at 339.

■■ The evidence at trial showed defendant was the actual murderer. He shot Thomas at close range, without provocation and as Thomas stood in a helpless position. The accomplice, although accountable for the death by his participation in the attempt armed robbery, did not do the actual killing. Further, the defendant had been convicted of armed robbery only the year before he committed the present crime. Under these circumstances, the disparity is not improper.

Judgment affirmed.

McNAMARA and McGILLICUDDY, JJ., concur.