ILLINOIS OFFICIAL REPORTS

## *People v. Daheya*, 2013 IL App (1st) 122333

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SABER DAHEYA, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-2333 |
| Filed | November 8, 2013 |
| Rehearing denied | January 17, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The testimony of three witnesses who said that they saw defendant standing at an intersection and aiming a handgun at the vehicle in which the witnesses were riding and then firing several shots was sufficient to establish defendant's guilt of aggravated discharge of a firearm, notwithstanding defendant's contention that there was no evidence of any property damage to any vehicles or neighboring residences, since poor marksmanship is not an affirmative defense, whether defendant lacked the intent to shoot the witnesses' vehicle or was an unskilled shooter was a question of fact for the trier of fact, and the trial court's finding that defendant was a "bad shot" would not be disturbed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-10475; the Hon. Larry G. Axelrood, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Scott F. Main, of DePaul Legal Clinic, DePaul University College of Law, of Chicago, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. |
| | Justices Palmer and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial, defendant Saber Daheya was convicted of four counts of aggravated discharge of a firearm and sentenced to seven years in the Illinois Department of Corrections. 720 ILCS 5/24-1.2(a)(2) (West 2008). At trial, three eyewitnesses, Jermaine Fox, Fox's girlfriend Amanda Padilla, and Ndeyiah Corneh, testified that, on June 14, 2011, they were traveling in a minivan near Jensen Park in Chicago when they observed defendant running toward their vehicle aiming a handgun and heard four shots being fired. Fox and Padilla testified that defendant was a member of the Conservative Vice Lords street gang, which was a hostile rival to the gang that Fox was associated with, the Simon City Royals.[1] Fox and Padilla also testified that Christian Ramos and Zay Russell were with defendant at the time of the shooting; however, Ramos testified that he was in school that evening and the parties stipulated that Russell was not present because he was incarcerated. Responding police officer John Geisbush testified that he recovered four bullet shell casings at the scene of the crime, though he did not discover any property damage to nearby residences or vehicles.

¶ 2    A fourth eyewitness, Jessica Palmer, signed a handwritten statement for the police that stated that she observed defendant running toward the vehicle holding his waistband moments before she heard gunshots, but she recanted her statement at trial, claiming that she did not observe defendant and that the police forced her to sign the statement. Assistant State's Attorney (ASA) Bob Groebner testified that Palmer provided her signed statement voluntarily and without coercion.

---

[1]As the trial court noted, the issue of gang membership is an "amorphous" concept, since the eyewitnesses distinguished between gang membership and gang affiliation, while personally denying any current association with gangs.

¶ 3    On this direct appeal, defendant claims that the State failed to prove him guilty beyond a reasonable doubt because there is no physical evidence that links defendant to the crime, and that Fox and Padilla are biased witnesses since they are affiliated with a street gang that is a rival with defendant's gang. Defendant also points to inconsistencies in Fox's and Padilla's testimony to argue that they are not credible, such as the misidentification of Ramos and Russell at the scene of the crime. Defendant also argues that Corneh's testimony alone is not sufficient to affirm the conviction because she testified that she did not actually observe defendant fire the handgun. For the following reasons, we affirm defendant's conviction and sentence.

¶ 4                                    BACKGROUND

¶ 5    Prior to trial, defendant was charged with four counts of aggravated discharge of a firearm and three counts of attempted murder. The State argued in its opening statement at trial that defendant fired a handgun at Padilla and Fox's vehicle because they were affiliated with a rival gang. The State called seven witnesses, including four eyewitnesses, two police officers, and the assistant State's Attorney who obtained the handwritten statement from Palmer. The defense called Christian Ramos, who testified that he was in school during the shooting, and Detective Thomas Kolman, who testified that he canvassed the area near the crime scene the day after the shooting and did not find any property damage or additional witnesses. Defendant exercised his constitutional right not to testify.

¶ 6                            I. Amanda Padilla's Testimony

¶ 7    Amanda Padilla testified that she is 18 years old and that Jermaine Fox is her boyfriend. On the evening of June 14, 2011, Fox was driving a motor vehicle to pick up her friend, Ndeyiah Corneh, at Jensen Park in Chicago, and Padilla was sitting in the front passenger side of the vehicle. Fox was driving his grandfather's minivan southbound on North Lawndale Avenue, which is a single-lane, one-way street with vehicles parked on each side of the street. Jensen Park is located on the west side of Lawndale Avenue, between Leland Avenue on the north and Wilson Avenue on the south. Fox stopped the vehicle halfway down the block, and Corneh entered the passenger side of the vehicle and sat in the backseat behind Padilla. Fox continued driving south on Lawndale Avenue and slowed down as they approached the intersection at Wilson Avenue.

¶ 8    At that point, Padilla observed a group of people walking along the sidewalk on the west side of Lawndale Avenue, and she recognized them as defendant, Jessica Palmer, Christian Ramos, Jerrell Russell, and Zay Russell. Padilla knew defendant because she had previously observed him two or three times per week at school, in the neighborhood, and in Jensen Park. Padilla identified defendant in court. As the group walked near the vehicle, Padilla felt concerned for her safety because there was hostility between the street gang that people in the group were members of, the Conservative Vice Lords, and the gang that Fox was associated with, the Simon City Royals.

¶ 9    As the vehicle stopped at the stop sign at the intersection of Lawndale and Wilson Avenues, Padilla observed defendant run toward them, while the rest of the group stayed

behind and watched. Defendant stopped at the corner, removed a black handgun from under his shirt, and pointed it at the vehicle. Padilla asked Fox to drive away, saying, "Go. He has a gun," but Fox had to wait for a jogger that was crossing the intersection on the other side of Wilson Avenue. Defendant then adjusted the handgun as Fox drove through the intersection. From a distance "[a]bout a car's length away," defendant fired four shots at the vehicle. Padilla had an unobstructed view of defendant, and it was still daylight.

¶ 10 After defendant fired at the vehicle, people in the park, including defendant, ran in various directions. Fox continued to drive south on Lawndale Avenue from the intersection as Padilla called the police on her cellular telephone. Fox then returned to the park, and several police officers arrived. Padilla exited the vehicle and told the officers what she observed. She identified defendant as the shooter, and she voluntarily looked up his last name by logging on to Facebook on her cellular telephone.

¶ 11 On cross-examination, Padilla testified that she was not a member of any street gang, but admitted that she has been found "delinquent" as a minor for possession of a stolen motor vehicle. Padilla testified that, the day after the shooting, she did not tell Detectives Kolman and Katz[2] that defendant was a gang member, or that she had observed the entire group running toward the corner with defendant, rather than standing behind.

¶ 12 Padilla admitted that, when she warned Fox that defendant had a handgun, Fox was already facing forward and did not look back as he drove through the intersection. She observed Corneh ducking her head down. At that moment, Padilla also turned around and faced forward as the vehicle drove through the intersection. Padilla first testified that she observed the handgun discharge, but when asked to describe what she observed, she admitted that she did not actually observe defendant fire the gun but heard the first shot. Padilla observed defendant aiming the handgun with two hands, but did not observe any bullets strike the vehicle. At the time, Padilla, Fox, and Corneh did not display gang signs or yell out the window to instigate the shooting.

¶ 13                                    II. Jermaine Fox's Testimony

¶ 14 Jermaine Fox testified that Padilla is his girlfriend. On June 14, 2011, he and Padilla were traveling in his grandfather's minivan to pick up Padilla's friend Corneh at Jensen Park. After picking up Corneh, Fox drove the vehicle southbound on Lawndale Avenue, a one-way street, and slowed down as he approached a stop sign at the intersection with Wilson Avenue. Fox observed a group of people walking south along the sidewalk in Jensen Park, but he did not pay attention at first to who was in the group and he continued driving.

¶ 15 As Fox stopped the vehicle at the intersection, Padilla warned him that one member of the group was approaching the vehicle with a gun. Fox turned back to look and he observed defendant, whom he knew from the neighborhood, running toward them and pointing a black handgun in the direction of the vehicle. The rest of the group, including Christian Ramos and Zay Russell, stood behind defendant and screamed at him. Fox identified defendant in court

_____

[2]Detective Katz's first name does not appear in the appellate record.

and explained that he knew defendant from the Albany Park neighborhood. Defendant stopped for a moment and adjusted his handgun, while a jogger crossed the intersection, preventing Fox from speeding away. As the jogger crossed Lawndale Avenue, Fox drove through the intersection, and he observed defendant fire four shots at the vehicle from the distance of "about a car's length." Nothing obstructed Fox's view of defendant, and he did not observe anyone else with a firearm. It was still daylight at the time of the shooting, and the windows on the passenger side of the vehicle were rolled down.

¶ 16    Everyone that was present in the park at the time of the shooting, including defendant, ran away after defendant fired his handgun. Fox continued to drive away from the intersection while Padilla called the police on her cellular telephone. The 911 operator told Padilla to return to the park, so Fox drove back to the intersection of Lawndale and Wilson Avenues, and the police were already there when they arrived. Fox did not discuss the incident with Padilla and Corneh before they returned to the park because they were "still in shock." Fox told the police what he observed, and Padilla showed defendant's Facebook page to a police officer to identify defendant's last name.

¶ 17    On cross-examination, Fox testified that he was never a "member" of the Simon City Royals street gang, though he had been "affiliated" with the gang in the past because he was friends with gang members. Fox testified that he did not remember telling Detectives Kolman and Katz that he was a member of the Simon City Royals gang. Though Fox denied a current gang affiliation, he stated that Padilla was affiliated with the Simon City Royals because she associated with members of the gang.[3] Fox did not display any gang signs or do anything else to instigate the events, and Jensen Park was considered a neutral territory for children and was not run by any particular gang.

¶ 18    Fox testified that he was looking straight ahead when he heard the first gunshot, but he looked back over his shoulder and observed defendant fire the handgun in the direction of the minivan a second and third time. Fox also described defendant as aiming the handgun at the vehicle with one hand, not two as Padilla previously testified. Fox did not hear any bullets strike the vehicle.

¶ 19                           III. Ndeyiah Corneh's Testimony

¶ 20    Ndeyiah Corneh testified that she is 15 years old and is friends with Padilla. On June 14, 2011, Fox and Padilla picked up Corneh from Jensen Park, and she entered the passenger side of the vehicle and sat behind Padilla. Fox then drove the vehicle south on Lawndale Avenue and slowed down because there was a vehicle in front of them stopped at the stop sign at the Wilson Avenue intersection. Corneh noticed a group of people walking south along the sidewalk on the west side of Lawndale Avenue, and she recognized one member

---

[3]The trial court noted that it "did not know what to make" of Fox's and Padilla's testimony concerning gang membership, and as far as it pertained to the charges that defendant faced, the issue of who belonged to what gang did not "make a difference in the world."

of the group as a girl named Corrinn that she knew from school.[4] As the vehicle stopped at the intersection, Padilla turned around and stated that defendant was one of the people in the group. Corneh looked back and observed defendant at the intersection walking toward the vehicle holding a handgun. Corneh knew defendant from around the park, and she identified him in court.

¶ 21　　From a distance of "a car's length apart," defendant stood at the end of the sidewalk with one foot in the street and raised a handgun, aiming it at the vehicle. There was nothing between Corneh and defendant that obstructed her view, and it was still daylight at the time. Corneh then ducked her head down and heard three or four gunshots fired in quick succession. Fox drove from the intersection and Corneh did not raise her head until they were near Sunnyside Avenue, one city block south. Padilla called the police on her cellular telephone, and they returned to the park as the police instructed. Corneh identified herself to a police officer, and Padilla told the police what had happened.

¶ 22　　On cross-examination, Corneh testified that Padilla was previously affiliated with the Simon City Royals and that she did not know if Fox was a member of the gang. No one in the vehicle displayed gang signs or yelled out of the window to provoke a confrontation with the group.

¶ 23　　　　　　　　　　　IV. Jessica Palmer's Testimony

¶ 24　　Jessica Palmer testified that she is 15 years old, and on the evening of June 14, 2011, she was playing basketball with a group of friends in Jensen Park, and never left the park prior to the shooting. Two of Palmer's friends, Corrine and Albert, were present in the park that evening.[5] Palmer was playing basketball when she heard gunshots and she immediately ran toward Leland Avenue. Palmer stopped at the park's playground and picked up her younger brother, Thomas,[6] and the two ran home. Prior to the shooting, there were dozens of people in the park, and Palmer only knew a few of them. Palmer testified that she did not know defendant, and that she did not remember if she observed him in the park that evening. Palmer also did not remember observing Jerrell Russell in the park that evening.

¶ 25　　The next day, the police arrested Palmer at school and took her to the 17th District police station where they questioned her about the shooting. After an hour, the police called Palmer's mother, who arrived at the police station and sat next to Palmer while the police questioned her further. Afterwards, an assistant State's Attorney interviewed Palmer concerning what she observed prior to the shooting. Palmer felt threatened and scared, and she and her mother were crying, so Palmer told the police a false story. The police then wrote down what Palmer said and forced her to sign the statement.

---

[4]Corrinn's last name does not appear in the appellate record.

[5]Neither Corrine nor Albert's last name appears in the appellate record. The name Corrine may also have been erroneously transcribed as "Corrinn" elsewhere in the record.

[6]Thomas's last name does not appear in the appellate record.

¶ 26    In her original signed statement to the police, Palmer stated that, while she was playing basketball in Jensen Park on June 14, 2011, she left the park for a short time with her friend Corrine, and the two walked to Corrine's house, which was nearby.[7] After Corrine checked in with her parents, she and Palmer walked back to Jensen Park. When they returned, Palmer observed her friend Albert speaking with Jerrell, and then the two walked toward the basketball court. Jerrell then pointed to a gold-colored minivan and shouted, "There they go, right there." Palmer then observed a man, who she knew from the park, run toward the minivan holding his waistband.[8] Palmer lost sight of defendant because there were parked vehicles on Lawndale obstructing her view. Palmer then heard three gunshots. At trial, Palmer claimed that she did not remember making any of these statements to the police or the assistant State's Attorney, other than that she had heard three gunshots. Her statement concluded that, after the shots were fired, everyone in the park scattered and Palmer picked up her younger brother from the playground and ran home.

¶ 27    On cross-examination, Palmer testified that she had met defendant prior to the shooting and that she had observed him at Jensen Park on prior occasions. Palmer denied knowing Zay Russell, Christian Ramos, or Ndeyiah Corneh. Palmer testified that Padilla had fought with her three or four months prior to the shooting, and that she knew that Fox was Padilla's boyfriend. Palmer testified that she did not remember which direction she heard the gunshots originate from, and that she did not remember exactly how many shots were fired. Palmer stated that she did not observe defendant, or anyone else, run toward the minivan holding his waistband.

¶ 28    Palmer explained that, the day after the shooting, she was arrested at school and transported to the 17th District police station and placed alone in a holding cell. Two hours later, an unidentified officer entered the cell and grabbed Palmer and threatened that she would go to jail if she did not talk. Palmer did not verbally reply to the officer, and he then led Palmer out of the cell and into an interrogation room, where another unidentified officer joined him in threatening Palmer with jail if she did not speak. The officers then left Palmer alone in the room for another two hours, until Palmer's mother arrived at the police station. Palmer's mother entered the room and sat next to Palmer, followed shortly afterward by a third unidentified police officer. The officer then told Palmer that other witnesses had implicated her in the shooting, and he questioned Palmer about the events leading up to the shooting. Palmer testified that she then "made up a story" because she believed that doing so would spare her a trip to jail. Palmer was then forced to sign a statement that detailed a false account of the shooting, and she was not given an opportunity to read it.

---

[7]At this point, the trial court admonished Palmer for her improper attitude in responding to the assistant State's Attorney's questions.

[8]Palmer's statement originally named this individual as defendant, but at some point his name was crossed out, and Palmer's initials appear next to the correction. However, Palmer identified defendant in a photograph as the man that she observed running toward the minivan.

¶ 29                    V. Police Officer John Geisbush's Testimony

¶ 30      Officer John Geisbush testified that he has been a police officer for the Chicago police department for nine years. On the evening of June 14, 2011, Officer Geisbush was patrolling the area near Jensen Park in a marked police vehicle with his partner, Officer Patricia Ramirez. At 7:15 p.m., Geisbush and his partner received a radio dispatch that gunshots were fired in Jensen Park, and they drove to the intersection of Lawndale and Wilson. A few minutes after their arrival, a tan Kia Sedona minivan drove up to the intersection and the occupants exited and identified themselves as Jermaine Fox, Amanda Padilla, and Ndeyiah Corneh. Geisbush and his partner first spoke with Padilla, who told them that she observed defendant fire a handgun at the vehicle. Geisbush next spoke with Fox and Corneh concerning the shooting. All three witnesses pointed out the northwest corner of the intersection as the place where defendant was standing when he shot at the vehicle. Geisbush walked over to the area and observed four spent shell casing lying in the street. Geisbush recovered the shell casings, placed them in a bag, and inventoried them.

¶ 31      After speaking with the three witnesses, Geisbush sent out a flash message[9] describing the suspect as a black male, 5 feet 7 inches and 130 pounds, named "Saber," and wearing a black hat, black shirt, and black jeans. The message also described three other suspects that were in the group, including Jerrell Russell, Christian Ramos, and Jessica Palmer. The flash message did not identify Zay Russell as a suspect. At some point, Padilla voluntarily logged on to Facebook on her cellular telephone and looked up defendant's last name, which she provided to Geisbush.

¶ 32      On cross-examination, Officer Geisbush testified that his supervisor arrived at the crime scene and ordered him to recover the shell casings instead of waiting for an evidence technician to do it. Geisbush surveyed the vehicle and did not find any damage from the shooting, and he and his partner later canvassed the area but did not find any property damage to nearby vehicles or residences or any additional eyewitnesses.


¶ 33                   VI. Police Officer Matthew Rogus's Testimony

¶ 34      Officer Matthew Rogus testified that he has been a Chicago police officer for eight years. On June 15, 2011, Officer Rogus read a case report at the 17th District police station concerning the shooting in Jensen Park the previous day. While reading the report, Rogus recognized defendant from previous encounters in the 17th District, and he knew defendant was a member of the Conservative Vice Lords gang. Rogus and five other officers then drove to a building on North Central Park Avenue where many Conservative Vice Lords were known to congregate. Rogus had previously observed defendant at the residence several times prior to June 15, 2011, most recently within the past week.

¶ 35      When Rogus arrived at the location, he observed defendant and Jerrell Russell near the front of the building smoking cigarettes. As Rogus and his team exited their vehicles,

---

[9]A flash message is a broadcast of updated information from the crime scene that is transmitted to nearby police officers.

-8-

defendant and Jerrell ran away from the officers to the back of the residence. Rogus yelled, "Stop, police," and chased after the suspects. Defendant stopped near the porch and was arrested, and Jerrell was arrested inside the building soon afterward.

¶ 36    On cross-examination, Rogus testified that the building where he arrested defendant was Jerrell's residence. Rogus admitted that he did not know for sure if defendant was a member of a street gang, but he based his assumption that defendant was a Conservative Vice Lord on whom he had observed defendant associate with in the past. Rogus did not observe any gang tattoos on defendant's body.

¶ 37    After Rogus' testimony, the parties stipulated that, if called to testify, Aimee Stevens would state that she is a forensic scientist with the Illinois State Police crime lab, and that she is an expert in firearms identification. Stevens would further testify that she analyzed the four shell casings recovered from the crime scene and opined that they were all fired from the same .380-caliber handgun. The State's next witness, ASA Robert Groebner, was unavailable, so the trial court allowed the defense to call its first witness out of order.

¶ 38                    VII. Christian Ramos's Testimony

¶ 39    Christian Ramos testified that he is 20 years old and that he knew defendant from high school but he never observed defendant off of school grounds. Ramos had observed Palmer in Jensen Park on occasion, but he did not know her personally. Ramos met Jerrell once or twice, but he did not know him very well. Ramos did not know who Corneh was. On June 14, 2011, Ramos was attending class at Harry S. Truman College in Chicago from 5:30 p.m. until 10 p.m., and he was not in Jensen Park that evening.

¶ 40    Sometime afterward, the police stopped Ramos while was driving and told him that witnesses implicated him in the shooting at Jensen Park on June 14, 2011. Ramos was placed in custody and transported to the police station where he explained to the officers that he was in school at the time of the shooting, and he was released five or six hours later.

¶ 41    On cross-examination, Ramos testified that, prior to trial, he initially told the assistant State's Attorney that he did not remember whether he was arrested in April 2011 or August 2011, but he ultimately deduced that the police arrested him on August 7, 2011, though he was not sure of the exact date. Ramos also did not remember the date of the shooting, but he knew that it occurred on a Tuesday.[10] Ramos admitted that he was found delinquent as a minor of unlawful use of a weapon in either 2004 or 2005 and he received probation. Ramos was also found delinquent of aggravated battery in 2008 and he was sentenced as a juvenile to the Illinois Department of Corrections.

¶ 42    After Ramos's testimony, the State resumed its case-in-chief and called its final witness, ASA Bob Groebner.

¶ 43                    VIII. ASA Bob Groebner's Testimony

¶ 44    ASA Bob Groebner testified that, on June 15, 2011, he was working in the felony review

---

[10]The date of the shooting, June 14, 2011, did in fact fall on a Tuesday.

unit for the Cook County State's Attorney, and his duties included interviewing witnesses, victims, and defendants in criminal cases. That day, Groebner was assigned to interview Palmer, who was identified as a witness to the Jensen Park shooting the previous day. Groebner drove to the 17th District police station and met with Palmer, who was accompanied by her mother in an interview room. Groebner introduced himself as a prosecutor, and both Palmer and her mother consented to having a conversation with him concerning the shooting. After a 20-minute discussion, Palmer agreed to provide a handwritten statement memorializing what she witnessed at the park. Groebner asked Palmer questions about what she observed, and he summarized each of her answers in the statement.

¶ 45    After the interview, Groebner asked Palmer and her mother if they felt they had been treated fairly by the police, and both responded yes. Palmer was a witness and was never handcuffed during the interview. Palmer testified that her statement was given freely and voluntarily and that the police did not threaten her or make any promises to her. In the presence of her mother, Palmer read the first page of her statement out loud, and she signed the page after affirming that the information was accurate. Groebner read the rest of the statement out loud, and Palmer corrected the statement on page three, requesting that defendant's first name be crossed out because Palmer did not know him by name and that she knew him from observing him around the park. Groebner crossed out defendant's first name, and Palmer, her mother, Groebner, and Detective Katz placed their initials next to the correction. Palmer then signed each page after acknowledging that the statements contained therein were accurate. In addition, Groebner, Palmer's mother, and Detective Katz signed each individual page. Groebner did not force Palmer to sign the statement. Groebner identified the handwritten statement in court and it was offered into evidence without objection.

¶ 46    On cross-examination, Groebner testified that one of the police reports he reviewed prior to interviewing Palmer indicated that witnesses observed Palmer standing next to the shooter, though Palmer had been excluded as a suspect by the time Groebner arrived at the police station. Groebner interviewed Russell[11] and took a handwritten statement from Fox, but he did not speak with Padilla, Corneh, Ramos or Palmer's friends, Albert and Corrinn. Palmer and her mother appeared to have a "normal" demeanor at the police station and did not appear to have been crying.

¶ 47    After Groebner's testimony, the State rested, and the trial court denied the defense's motion for a directed finding.

¶ 48                    IX. Detective Thomas Kolman's Testimony

¶ 49    The defense's second witness was Detective Thomas Kolman, who testified that he has been a Chicago police officer for 18 years. On June 15, 2011, Detectives Kolman and Katz were assigned to investigate the previous day's shooting. Defendant, Jerrell, and Palmer were already in custody when Kolman arrived at the 17th District police station. Kolman first reviewed the police reports concerning the shooting and then learned that Padilla, Fox, and

---

[11]Groebner does not state whether he is referring to Jerrell Russell or his brother Zay.

Corneh were at the police station and were available to be interviewed. Kolman first spoke with Padilla, who stated that she observed defendant, Russell,[12] Ramos, and Palmer running toward the minivan just before the shooting, and that Fox was a Simon City Royal gang member at that time. Kolman next interviewed Fox, and he told Kolman that he also observed defendant, Russell, Ramos, and Palmer running toward the minivan. Fox told Kolman that he was a Simon City Royal gang member in the past and still was a current member of the gang. Kolman did not interview Ramos, or either of Palmer's friends, Albert or Corrinn. Though Kolman did not meet with Palmer, he observed her in a processing room and noted that she was not in handcuffs and testified that she was never placed in a holding cell.

¶ 50    Kolman and Katz recanvassed the area near the crime scene on June 16, 2011, and they did not locate any additional witnesses or discover property damage to nearby vehicles or residences as a result of the shooting. Kolman did not perform a gunshot residue test on defendant to determine if he had recently fired a handgun because too much time had passed since the shooting. Also, Kolman explained that the shell casings were not sent to the Illinois State Police crime lab for fingerprint analysis because he is not allowed to do that.

¶ 51    On cross-examination, Kolman testified that he did not present a photo array or physical lineup to the victims because all three stated that they personally knew defendant.

¶ 52    Following Kolman's testimony, the parties stipulated that Zay Russell was in the custody of the Illinois Department of Corrections on June 14, 2011. Defendant exercised his right not to testify, and the defense rested.

¶ 53    During closing arguments, the State argued that defendant escalated the feud between the rival gangs when he fired four shots at the vehicle and that the witnesses were credible because: (1) they had no bias toward defendant personally; (2) they had little time to fabricate a story after the shooting; and (3) their testimony was corroborated by Palmer, who initially told the police that she observed defendant run toward the vehicle shortly before she heard gunshots. The State claimed that the victims' testimony was further corroborated by the recovery of four shell casings at the intersection and that there was no damage discovered because defendant had poor aim.

¶ 54    The defense argued that the State failed to prove defendant guilty beyond a reasonable doubt because Fox's and Padilla's gang affiliations showed that they had a motive to lie about the shooting. Their credibility was further challenged by the fact that they both testified that Ramos and Zay Russell were in the group with defendant, but Ramos testified that he was in school at the time, and the parties stipulated that Zay was incarcerated during the shooting. The defense claimed that the younger Corneh was "playing follow the leader" by changing her story to fit whatever Fox and Padilla said, and the defense noted that she did not testify that she actually observed defendant fire the handgun. Further, the defense argued that Palmer recanted her signed statement because the police threatened her with jail. The defense also claimed that there was no physical evidence that corroborated the victims' testimony because: (1) no handgun was recovered; (2) there was no gunshot residue test

---

[12]Kolman does not state whether Padilla was referring to Jerrell Russell or his brother Zay.

performed; and (3) there were no fingerprints or DNA linking defendant to the crime. The defense concluded that there would have been damage to the vehicle had defendant shot at it from such a close distance.

¶ 55 After closing arguments, the trial court stated that it assessed the credibility and demeanor of the witnesses, and that it relied on each witness's credibility. The trial court determined that Fox and Padilla were credible, and that Corneh was the most reliable witness, rejecting the claim that she fabricated her story to fit Fox's and Padilla's accounts of the events. The trial court discredited Palmer's testimony and found that she was "an awful witness" who told "absurd, ridiculous lies" in her testimony to "get out from under the statements that she made earlier." The trial court noted that ASA Groebner's testimony indicated that Palmer had lied in court. The trial court also determined that Ramos lied about being in school, finding that he "has no idea what happened, he has no idea when it happened, but knows that he has an alibi for it." The trial court concluded that there was "no doubt" that defendant fired a handgun at the vehicle, and it found defendant guilty of all four counts of aggravated discharge of a firearm. However, the trial court found defendant not guilty on the three counts of attempted murder, explaining that the State did not meet the high burden of proof to establish the specific mental state and intent.

¶ 56 The defense filed a posttrial motion for a new trial, claiming that the State did not prove that defendant fired the handgun in the direction of the vehicle because there was no evidence of any damage to the vehicle or to nearby property. The trial court denied the motion and stated that it would not reward defendant for not being "a better shot."

¶ 57 The trial court held a sentencing hearing, and after hearing factors in aggravation and mitigation, it sentenced defendant to seven years in the Illinois Department of Corrections, with 400 days credit for time served, 2 years' mandatory supervised release, and $714 in mandatory fines, fees, and costs. Defendant appeals his conviction and sentence.

¶ 58 ANALYSIS

¶ 59 On appeal, defendant argues that the State did not prove him guilty beyond a reasonable doubt because Fox and Padilla are biased witnesses since they are affiliated with a rival street gang. Defendant also points to inconsistencies in Fox's and Padilla's testimony to argue that they are not credible, such as the misidentification of Ramos and Russell at the scene of the crime. Defendant also argues that Corneh's testimony alone is not sufficient to affirm the conviction because she testified that she did not actually observe defendant fire the handgun. Additionally, defendant claims that there is no physical evidence that links defendant to the crime. For the following reasons, we find the evidence sufficient for a finding of guilty of aggravated discharge of a firearm, and we affirm.

¶ 60 I. Standard of Review

¶ 61 When a defendant challenges the sufficiency of the evidence, the standard of review is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting

-12-

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Under this standard, the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "[T]he fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court." *Cunningham*, 212 Ill. 2d at 280. "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008); *People v. McGee*, 398 Ill. App. 3d 789, 793 (2010).

¶ 62        In a bench trial, the trial judge has the responsibility to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. *People v. Spann*, 332 Ill. App. 3d 425, 445 (2002) (citing *People v. Slim*, 127 Ill. 2d 302, 307 (1989)). A reviewing court must give the State the benefit of all reasonable inferences. *People v. Wheeler*, 226 Ill. 2d 92, 116-17 (2007) (quoting *Cunningham*, 212 Ill. 2d at 280). The evidence of a single witness is sufficient to convict if the witness is found to be credible. *People v. Smith*, 185 Ill. 2d 532, 541 (1992). Testimony may be found insufficient to convict only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280.

¶ 63                                        II. Sufficiency of the Evidence

¶ 64        Defendant argues that the State's evidence was insufficient to convict him of aggravated discharge of a firearm. "A person commits aggravated discharge of a firearm when he or she knowingly or intentionally *** [d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2(a)(2) (West 2008); *People v. Hardin*, 2012 IL App (1st) 100682, ¶ 28. An essential element to aggravated discharge of a firearm is the defendant's awareness of the presence of an individual in the direction in which he fires a weapon. *People v. Kasp*, 352 Ill. App. 3d 180, 187-88 (2004). However, it is not an inherent element of the offense that the bullets actually strike the vehicle or that the bullets strike near a window of the vehicle. *People v. Ellis*, 401 Ill. App. 3d 727, 731 (2010).

¶ 65        In the case at bar, the State proved defendant guilty of aggravated discharge of a firearm beyond a reasonable doubt, where Padilla, Fox, and Corneh all testified that defendant stood at the intersection of Lawndale and Wilson Avenues, aimed a handgun at their vehicle, and fired four shots. Fox in particular stated that he observed the handgun discharge when defendant fired the second and third shots, and that defendant was aiming at their vehicle as he fired his gun. The lighting at the intersection was sufficient, where there was still daylight, the vehicle's windows were rolled down, and there was nothing obstructing the witnesses' view of defendant. All three eyewitnesses were able to identify defendant since they knew him personally before the shooting. Their testimony was also corroborated by physical evidence, since Officer Geisbush testified that he recovered four shell casings lying in the

northwest corner of the intersection, and the parties stipulated that forensic scientist Stevens tested the shell casings and found that they were fired from the same handgun. The trial court assessed the credibility and demeanor of the witnesses and found that the three eyewitnesses were credible. *Ross*, 229 Ill. 2d at 272. We cannot say that the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Rowell*, 229 Ill. 2d at 98.

¶ 66 Defendant argues that Fox and Padilla were biased witnesses because they were associated with a street gang hostile to defendant's gang and thus were motivated to lie at trial to incriminate defendant. Defendant claims that the trial record shows that Fox and Padilla fabricated their testimony because they both identified Christian Ramos and Zay Russell as present in the park on the night of the shooting, despite Ramos's conflicting testimony that he was in school that evening, and the parties' stipulation that Russell was already in custody for an unrelated offense.

¶ 67 As the trial court stated, the issue of gang association was an "amorphous" concept that was difficult to delineate in the case at bar. At trial, Fox and Padilla testified that Fox was once affiliated with the Simon City Royals but he ceased ties with that gang sometime before the shooting. However, both witnesses denied any current involvement in a street gang, and Corneh testified that Padilla currently affiliated herself with the Royals because she "hung out" with members of that gang. Based on this evidence, we cannot say that Fox and Padilla had a clear motive to lie because neither expressed any current association with a street gang. Though Corneh explained that Padilla was friends with members of the Royals, this friendship does not demonstrate that she was then motivated to falsely accuse a rival gang member of committing a crime. This was especially true of defendant, whom Padilla admitted that she felt no animosity toward. The trial court stated that it did not know "what to make" of the differing accounts of the eyewitnesses' connection to gangs, and that the issue ultimately did not matter in its finding that Fox, Padilla, and Corneh were all credible. We cannot say that the record evidence compels the conclusion that no reasonable person could accept their testimony beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280.

¶ 68 Even if we found that Fox and Padilla held a personal bias against defendant's gang and had a motive to lie, we cannot say that their identification of Ramos and Russell at the crime scene proves that their stories were fabricated. Though Ramos testified that he was in school during the shooting, he did not remember when the shooting occurred or when he was arrested. The trial court found that Ramos was not a credible witness, noting that Ramos initially could not recall if he was arrested in April or August, and that he insisted that he was in school during the shooting even though he did not remember when the shooting occurred. Also, the misidentification of Zay Russell is a minor discrepancy in light of the totality of Fox's and Padilla's testimony, and the trial court weighed the inconsistencies and determined that Fox and Padilla were credible. *Spann*, 332 Ill. App. 3d at 445.

¶ 69 Furthermore, Fox's and Padilla's accounts of the shooting were corroborated by Corneh, who was not associated with a street gang in any way. As stated, the testimony of a single eyewitness is sufficient to sustain a conviction. *Smith*, 185 Ill. 2d at 541. The trial court spoke in glowing terms about Corneh and found that she was the most credible witness, and it rejected defendant's argument that she was playing "follow the leader" to match her story

with Fox's and Padilla's account of the shooting. There is nothing in the record to suggest that Corneh was not a credible witness, and we cannot say that no reasonable person would accept her testimony beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280.

¶ 70　　Regardless of whether Corneh had a motive to lie, defendant argues that her testimony alone is not sufficient to support his conviction because she testified that she did not actually observe defendant fire the handgun. In support, defendant cites *People v. Hartfield*, 266 Ill. App. 3d 607, 608-09 (1994), which found that the evidence was insufficient to sustain the defendant's conviction because an eyewitness heard gunshots but never actually observed the defendant fire the gun.

¶ 71　　However, the State's evidence was sufficient to support a conviction here because Fox testified that he actually observed defendant firing the handgun somewhere between the second and third shots. Moreover, a trial court may draw reasonable inferences from the evidence. Here, Padilla testified that she observed defendant aiming a handgun at their vehicle and that she turned to face forward and heard four gunshots. Likewise, Corneh observed defendant aiming the gun at their vehicle before she ducked down and heard four gunshots. Though Padilla and Corneh did not actually observe the handgun fire, a reasonable inference may be drawn that defendant was still aiming the handgun at the vehicle when he fired the four shots shortly after the witnesses turned away. *Wheeler*, 226 Ill. 2d at 116-17.

¶ 72　　Also, *Hartfield* is distinguishable because, in that case, the fact that nobody testified that they observed the defendant fire the gun was crucial since the State failed to present any evidence whatsoever that the defendant aimed his weapon at a person. *Hartfield*, 266 Ill. App. 3d at 609. In the instant case, three eyewitnesses testified that defendant aimed a handgun at their vehicle, from which a reasonable inference could be drawn that defendant did not change his aim in the short time between which the witnesses looked away and heard the gunshots. *Spann*, 332 Ill. App. 3d at 445.

¶ 73　　Defendant additionally argues that the only eyewitness that was not also a victim, Jessica Palmer, recanted her prior signed statement and testified that she did not observe the shooting. Defendant compares the case at bar to *People v. Brown*, 303 Ill. App. 3d 949, 965 (1999), where we reversed the defendant's murder and attempted murder convictions because the sole eyewitness recanted his prior statement at trial. Defendant also cites *People v. Parker*, 234 Ill. App. 3d 273, 280 (1992), where the defendant's convictions of murder, armed violence, attempted murder, and aggravated battery were reversed because three eyewitnesses recanted their prior statements that implicated the defendant.

¶ 74　　However, the trial court found that Palmer was not a credible witness and that she had lied at trial to "get out from statements that she made earlier." See *Spann*, 332 Ill. App. 3d at 445. Also, *Brown* and *Parker* are distinguishable because, in those cases, there was no additional incriminating evidence aside from the recanted testimony. In *Brown*, testimony from two of the three eyewitnesses was found to be inadmissible hearsay, and the third eyewitness recanted his prior statement at trial. *Brown*, 303 Ill. App. 3d at 962. On appeal, we reversed the defendant's conviction, finding that there was no evidence to support the defendant's guilt other than a single witness's recanted statement. *Brown*, 303 Ill. App. 3d at 965-66. Likewise in *Parker*, the defendant's convictions were reversed because the only

evidence that incriminated the defendant was the prior statements of three eyewitnesses that were recanted at trial. *Parker*, 234 Ill. App. 3d at 280. We found that the "lack of credible eyewitness testimony in favor of the State, combined with the complete absence of any physical evidence tying defendant to the crime," prompted us to find that the evidence presented was insufficient to sustain the defendant's convictions. *Parker*, 234 Ill. App. 3d at 280. Our rationale in *Brown* and *Parker* is not applicable to the instant case because, here, there is additional eyewitness testimony and physical evidence sufficient to convict defendant absent Palmer's recanted prior statement.

¶ 75 Defendant also claims that his conviction should be reversed because there is no physical evidence linking him to the crime. Defendant notes that the police did not find a gun or other incriminating evidence on defendant's person or at the place of the arrest, and that the police did not test defendant for gunshot residue or for fingerprints on the shell casings.

¶ 76 However, since the trial court found that Fox, Padilla, and Corneh were credible and their testimony sufficient to convict defendant, the State was not required to present additional physical evidence that linked defendant to the shooting to prove defendant's guilt beyond a reasonable doubt. *People v. Ganter*, 56 Ill. App. 3d 316, 321 (1977). This argument is similar to the argument made in *Ganter*, where the defendant challenged his murder and armed robbery convictions arguing that the evidence against him was insufficient because the State did not present the murder weapon, fingerprint evidence, or any other evidence that the defendant fired the bullets at the victim. *Ganter*, 56 Ill. App. 3d at 324. We affirmed the defendant's conviction because there was credible eyewitness testimony that was sufficient to convict the defendant. *Ganter*, 56 Ill. App. 3d at 324. Likewise, in the instant case, the State presented credible eyewitness testimony from Fox, Padilla, and Corneh, all of whom testified that they observed defendant aim a handgun at their vehicle and fire four shots. Though this evidence alone is sufficient to convict defendant of aggravated discharge of a firearm, the testimony was corroborated by physical evidence because, at the scene of the crime, Officer Geisbush recovered four shell casings, all of which forensic scientist Stevens opined were fired from the same gun. Thus, the State in the case at bar was not required to present additional physical evidence to convict defendant. *Ganter*, 56 Ill. App. 3d at 324.

¶ 77 Further, defendant claims that since the police did not find any property damage to vehicles or nearby residences, it shows that defendant did not aim at the vehicle because, even if defendant were a "bad shot," there would have been some damage from a shooting at such a close range. Defendant states, without citation to authority, that damage is an important factor in determining in which direction the handgun was fired, even if it is not an element to the crime of aggravated discharge of a firearm.

¶ 78 As previously stated, to sustain a conviction, the evidence must show that defendant knowingly or intentionally fired the gun in the direction of another person or in the direction of an occupied vehicle (720 ILCS 5/24-1.2(a)(2) (West 2008)), and the State need not prove that the bullets actually struck the vehicle or that the bullets struck near a window of the vehicle. *Ellis*, 401 Ill. App. 3d at 731. Poor marksmanship is not an affirmative defense, and it is a question of fact for the fact finder to determine whether defendant lacked the intent to shoot the vehicle or whether he was simply unskilled with his weapon and missed his targets. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 27 (citing *People v. Green*, 339 Ill. App. 3d

443, 451 (2003), and *People v. Johnson*, 331 Ill. App. 3d 239, 250-51 (2002)). While defendant may argue that his failure to hit the vehicle supported an inference that he did not aim at the vehicle, the trial court was free to reject that argument and to draw instead the inference that defendant was simply an unskilled shooter. *Teague*, 2013 IL App (1st) 110349, ¶ 29. The trial court found defendant was a "bad shot," and we will not substitute our judgment for the judgment of the fact finder on appeal. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009) (when a defendant challenges the sufficiency of the evidence on appeal, the reviewing court will not "substitute its judgment for that of the fact finder").

¶ 79                                    CONCLUSION

¶ 80        For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 81        Affirmed.